# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

United States of America,

          Plaintiff,

v.

Shahla Marie Thompson (2),

          Defendant.

Crim. No. 19-203 (NEB/BRT)

**REPORT AND RECOMMENDATION**

Julie E. Allyn, Esq., United States Attorney's Office, counsel for Plaintiff.

Robert W. Owens, Jr., counsel for Defendant.

BECKY R. THORSON, United States Magistrate Judge.

## INTRODUCTION

Defendant Shahla Marie Thompson has been charged with Production of Child Pornography (Count 1) and Receipt of Child Pornography (Count 3).[1] (*See* Doc. No. 29, Indictment.) Originally, she moved to suppress any physical evidence obtained as a result of the search and seizure of her cell phone[2] on May 21, 2018, claiming that the "search and seizure was conducted without warrant, without probable cause, lacking in any exigent circumstances using coercive tactics while the defendant was in de facto

---

[1] Defendant Thompson's boyfriend, Adam Reitz, was also charged in the Indictment, but has since pled guilty to Count 1 of the Indictment. (Doc. No. 91.)

[2] Defendant Thompson's original motion referred to two cell phones (presumably the other one being Defendant Reitz's cell phone). In her post-hearing brief, she only challenges the search and seizure of the one cell phone that was hers.

custody." (Doc. No. 74, Def.'s Second Mot. to Suppress.) In her post-hearing brief, however, Defendant narrows her argument to a challenge regarding the seizure of her cell phone, contending that her consent to turn over her phone was not voluntary because she was threatened with a prolonged detention. (*See* Doc. No. 99, Def.'s Mem. in Supp. or Mot. to Suppress 2–3.) Defendant also moves to sever counts. (Doc. No. 54.) The Government opposes the motions.

The matter was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1. The undersigned held a hearing on Defendant's motions on October 30, 2019, and received three exhibits in evidence as Hearing Exhibits 1–3: (1) Body camera video of Officer Chris Weber; (2) Body camera video of Officer Chris Weber; and (3) the Olmstead County Search Warrant for Shahla Marie Thompson and Adam Reitz, and for the premises where they reside. (*See* Doc. Nos. 93, 94.) At the hearing, Officer Weber testified concerning the circumstances surrounding the seizure of Defendant's cell phone that is the subject of the motion to suppress. (*See generally* Doc. No. 98, 10/31/19 Hr'g Tr.) The parties submitted post-hearing briefing as ordered by the Court. (Doc. Nos. 99, 103, 104.) For the reasons set forth below, this Court recommends that Defendant's motions be denied.

## BACKGROUND[3]

The National Center for Missing and Exploited Children alerted the Rochester Police Department to a Facebook messenger communication between Defendants Reitz and Thompson appearing to contain a depiction of child pornography.[4] (Tr. 17–18.) Investigator Christopher Weber was assigned to investigate. (Tr. 18.) Through his initial investigation, Investigator Weber learned that Reitz and Thompson lived together at a certain residence in Rochester and were documented in local police reports as being in a relationship. (Tr. 19, 21, 25.) He also learned that Investigator Ann Johnson with the Special Victims Unit had an open Child Protection case related to Thompson and Reitz. (Tr. 22.)

Based on information that he had received, Investigator Weber wrote an affidavit for a search warrant for the residence of Reitz and Thompson and their persons, including any electronic devices and a forensic examination of any electronic devices. (Tr. 25.) Investigator Weber testified that he did this because he knew, based on prior investigations, that child pornography is easy to hide and can be found in a variety of different sizes on different electronic devices, most commonly in cell phones. (Tr. 25–26.) Investigator Weber obtained the search warrant on May 15, 2018. (Tr. 25.) He

---

[3]   The following summary is based on Investigator Weber's testimony provided at the October 31, 2019 hearing, along with the admitted exhibits. Investigator Weber has been an investigator for the Rochester Police Department for twelve years. His current role is an investigator in the Violent Crimes Unit. (Doc. No. 98, 11/04/19 Hearing Transcript ("Tr.") 15–16.)

[4]   An example of one of the Facebook messages is described at pages 19 to 20 of the November 4, 2019 Hearing Transcript. (Tr. 19–20.)

3

learned from Investigator Johnson that she had a meeting set with Thompson and Reitz in the Child Protection county offices (a public building)[5] on May 21, 2018. (Tr. 27.) Investigator Weber planned to go to Child Protection on that day to meet with Investigator Johnson, wait for Reitz and Thompson to show up, "explain the search warrant, try to collect cell phones and search their persons, and try to gather any information about who had been home at the residence, whether it was locked, . . . [and] try to get keys for the residence." (Tr. 27–28.)

On May 21, 2018, when Investigator Weber arrived at the county offices around 1:00 p.m., he activated his body-worn camera as he was walking in the front door of the building.[6] (Tr. 28, 32.) Investigator Johnson met Weber and directed him to a small, private conference room where Thompson and Reitz were sitting down at a table. (Tr. 28.) Investigator Johnson, wearing plain clothes, also entered the room. (Tr. 34.) Investigator Weber had brought Investigator Novak with him, who works in the department's High Technology Crimes investigation office, to help collect evidence. (Tr. 29.) Investigator Novak stayed outside of the room in the hallway. (Tr. 36.) Investigator Weber was wearing khaki pants, a dress shirt, and a black tactical vest with "police" in white lettering across it. (Tr. 30.) The tactical vest had a pouch for his taser, had a badge, and his body camera was attached to it. (Tr. 30.) On his waist, Weber had a

---

[5]   This county building is separate from the police department, courthouse, and jail, and is a public, non-secure building. (Tr. 29.)

[6]   Investigator Weber testified that he kept the camera on until after his contact with Thompson and Reitz was finished. (Tr. 31.) This initial video lasted approximately twenty minutes. (Tr. 31; *see also* Hrg. Ex. 1.)

4

badge and gun in a holster. (Tr. 30.) Investigator Novak was wearing casual clothes (including blue jeans), and he also was wearing a tactical vest. (Tr. 30.)

Once in the room, Investigator Weber told Thompson and Reitz that they were not under arrest and that even though he was seated[7] in front of the door, they could get by him if they wanted to. (Tr. 36.) He told them that he was investigating a case of reported child pornography—specifically a message sent between them[8]—and that he would be executing a search warrant at their residence. He provided them with a copy of the search warrant issued for their residence, their persons, and for a forensic examination of any electronic device. (Tr. 36–37; *see* Hrg. Ex. 3, Search Warrant.) Investigator Weber asked Thompson and Reitz whether anyone was home at their residence, if the residence was locked, and if they had their cell phones on their person. (Tr. 38.) He also explained to them that he would be searching their persons, which was then done.[9] (Tr. 38.)

Reitz told Investigator Weber that their cell phones were in a vehicle[10] outside. (Tr. 38.) Investigator Weber asked if they would walk out to the parking lot and consent to a search of their vehicle to get their phones but told them that they did not have to do so. (Tr. 39.) Reitz then asked if he could speak with an attorney. (Tr. 39.) Investigator

---

[7]   The Court reviewed Hearing Exhibits 1 and 2. The audio suggests that Investigator Weber was seated in front of the door, not standing.

[8]   Investigator Weber disclosed that he was "investigating a message sent between you guys." Hearing Exhibit 1.

[9]   Investigator Weber searched Reitz, and Investigator Johnson searched Thompson. (Tr. 38.)

[10]   The vehicle was Reitz's mother's vehicle. (Tr. 39.)

5

Weber told him that he could consult with an attorney and that that would not be a problem. (Tr. 39.) Weber took vehicle keys from Reitz and explained that he would be applying for a search warrant to search his vehicle, and that he would secure the vehicle in the parking lot while he went to write the search warrant.[11] (Tr. 39–40.) Weber also explained the process of obtaining a warrant so that he could search the vehicle to get their cell phones. (Tr. 39.) He encouraged them to speed up the process by providing their passwords in advance.[12]

Thompson then mentioned that she had to work the next day and stated that she would need to get her purse from the vehicle and asked how long it would take. (Tr. 40.) Investigator Johnson explained that this whole process would be done by then and that she would be able to have her purse in time for work. (Tr. 40.) According to Investigator Weber's testimony, Thompson then asked if they could just go get their phones and questioned whether they would be able to have the car back if they did so. (Tr. 40.)[13] Investigator Weber stated that he had no reason to hold the car if he was able to collect the phones. (Tr. 40–41.) Investigator Weber said that he was not trying to hold them

---

[11]   Investigator Weber testified that he would have secured the vehicle because child pornography is something "very easy to hide and very easy to destroy," and he did not want them to drive away with the phones and destroy them or delete files. (Tr. 45.)

[12]   Hearing Exhibit 1.

[13]   The Court could not hear this clearly from the audio file but notes that there is some inaudible discussion. Hearing Exhibit 1.

6

hostage but if they wanted to wait for an attorney, that was fine.[14] Reitz then clearly told Investigator Weber he could search the car. (Tr. 41.) Reitz offered to sign a form.[15]

Reitz, Thompson, Investigator Weber, and Investigator Novak then walked out to the parking lot together. (Tr. 41.) The video is difficult to follow, but depicts Thompson using the keys to open the driver's side door.[16] Thompson then asks if she can reach across to open the passenger side door. (Tr. 41.) Thompson retrieved her phone from the car, handed it to Investigator Weber, gave him the password for her phone, and explained to him how her password worked. (Tr. 41–42.) At no time did Thompson ask to consult with an attorney. (Tr. 42.) Also, at no time did Investigator Weber display his weapon or handcuffs, nor did he physically threaten either Reitz or Thompson to give up their phones. (Tr. 43.)

After the cell phones were collected, Investigator Weber asked if he could go into the car again to look for jump drives or flash drives.[17] The audio does not clearly pick up the response, but the keys jingle and a car door opens again.[18] Investigator Weber told Reitz and Thompson that they were free to go, but that he was planning to leave and search their house. (Tr. 44.) After that, Thompson asked how long it would take before their phones would be returned.[19] Both Thompson and Reitz suggested that Investigator

---

[14] Hearing Exhibit 1.
[15] Hearing Exhibit 1.
[16] Hearing Exhibit 1.
[17] Hearing Exhibit 1.
[18] Hearing Exhibit 1.
[19] Hearing Exhibit 1.

7

Weber contact Reitz's mother when their phones were ready for return.[20] After this, Investigator Weber talked about whether they wanted to talk to him further or wait to consult with an attorney. (Tr. 44–45.) Investigator Weber relayed that they would be in touch after the residence search. (Tr. 45.) Investigator Weber then left to search their house. (Tr. 45.)

After a couple of hours, Investigator Weber returned to the social services building. (Tr. 46.) He was able to speak with Reitz and Thompson a second time for approximately twenty minutes in a private room, again with his body camera activated. (Tr. 46–47; *see* Hrg. Ex. 2.) Investigator Weber again told them that they were free to go and that they were not under arrest. (Tr. 48.) During this second meeting, neither Reitz or Thompson asked for their phones back, and neither of them withdrew their consent to seize and search the phones. (Tr. 49.) At the end of the conversation, Investigator Weber gave Reitz and Thompson his business card, explained that they would be processing evidence that was collected, and told them he would be in touch with them. (Tr. 49.) Neither Reitz nor Thompson were arrested at that time. (Tr. 49.) Investigator Weber testified that the phones were later searched based both on the search warrant authorizing the search of any electronic devices collected, and on Reitz's and Thompson's consent to search. (Tr. 50.) The search revealed Google data on Thompson's phone; investigators then obtained a search warrant for Google drive, which ultimately revealed four images that form the charges in the Indictment. (Tr. 50–52.) Investigator Weber testified that he

---

[20]   Hearing Exhibit 1.

8

would have requested a search warrant for Google drive even without the seizure of Thompson's phone because he had previously learned that both Thompson and Reitz had gmail addresses. (Tr. 52–53.)

## ANALYSIS

### A. Defendant's Motion to Suppress Evidence

Defendant Thompson moves to suppress evidence obtained from her cell phone seized on May 21, 2018, arguing that her consent to turn over her phone was not voluntary because she was threatened with a prolonged detention. Defendant contends that all evidence obtained from the phones and "the fruit of that evidence must be suppressed," including evidence obtained by all search warrants "as a result of information Investigator Weber located on the phones." (Doc. No. 99, Def.'s Mem. in Supp. or Mot. to Suppress 2–4.)

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." *United States v. Davis*, 569 F.3d 813, 816 (8th Cir. 2009) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)). "The government bears the burden of establishing that an exception to the warrant requirement applies." *United States v. Williams*, 616 F.3d 760, 765 (8th Cir. 2010).

"Although a warrantless search presumptively violates the Fourth Amendment, voluntary consent to search is a well-recognized exception to the warrant requirement." *United States v. Golinveaux*, 611 F.3d 956, 959 (8th Cir. 2010). Therefore, a search of a vehicle does not violate the Fourth Amendment if it is based on consent. *Ballard v. Heineman*, 548 F.3d 1132, 1135 (8th Cir. 2008). And police officers may search an area without a warrant "if they obtain a voluntary consent from someone possessing adequate authority over the area." *United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir. 1990) (citing *United States v. Matlock*, 415 U.S. 164, 171 & n. 7 (1974); *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)).

The Fourth Amendment only requires that the officer reasonably believe that an individual has given consent to search. *United States v. Guerrero*, 374 F.3d 584, 588 (8th Cir. 2004) (quoting *United States v. Sanchez*, 156 F.3d 875, 878 (8th Cir. 1998)); *see also Williams*, 521 F.3d at 906–07 (stating that the question is not whether the person subjectively consented, but "whether his conduct would have caused a reasonable person to believe that he consented"). Whether consent was voluntarily given or was the result of duress or coercion depends on the totality of the circumstances, including the characteristics of the person and the context of the encounter. *United States v. Arciniega*, 569 F.3d 394, 398 (8th Cir. 2009); *United States v. Watters*, 572 F.3d 479, 483 (8th Cir. 2009); *United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir. 1990) (citing *Bustamonte,* 412 U.S. at 226). The Eighth Circuit has identified a number of factors that a court should consider in determining if consent was voluntary: (1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs;

(3) whether the individual was informed of his *Miranda* rights; (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals; (5) the length of the detention; (6) whether the police used threats, physical intimidation, or punishment to extract consent; (7) whether the police made promises or misrepresentations; (8) whether the individual was in custody or under arrest when consent was given; (9) whether the consent was given in public or in a secluded location; and (10) whether the individual stood by silently or objected to the search. *United States v. Golinveaux*, 611 F.3d 956, 959 (8th Cir. 2010); *Arciniega*, 569 F.3d at 398; *Chaidez*, 906 F.2d at 381. No single factor is dispositive or controlling. *United States v. Bradley,* 234 F.3d 363, 366 (8th Cir. 2000). "The government bears the burden of proving voluntary consent by a preponderance of the evidence and must show that on the totality of the circumstances the officer reasonably believed that the search was consensual." *United States v. Almendares*, 397 F.3d 653, 660 (8th Cir. 2005).

There is no evidence in the record suggesting Thompson's consent to turn over her phone was involuntary. The request for her phone occurred in a public place and the entirety of the interaction which led to the consent and retrieval of the phone occurred within twenty minutes. Thompson was told that she was not under arrest and that she was free to leave. Investigator Weber testified that at the time Thompson gave her consent, she did not appear to be under the influence of any alcohol or drugs and appeared to understand his questions and was asking questions herself that made sense in response to what was happening. (Tr. 43–44.) Thompson had been arrested on at least one prior occasion. (Tr. 21.) After being told several times that they did not have to consent to the

11

search, Defendants told Weber that they wanted to consent to provide their phones and offered to sign consent paperwork. (Tr. 41; *see also* Hrg. Ex. 1 at 9:25.) Defendant Thompson never asked to speak with a lawyer and did not object to retrieving her cell phone or to the search.

Also, at the time Investigator Weber sought consent to retrieve Defendant's cell phone, his weapon was holstered, and he did not use threats, promises, or intimidation to obtain the consent. Investigator Weber's explanation that he would need to obtain a search warrant if Defendants did not consent, which might have resulted in their vehicle being secured overnight, was not a threat or coercive in nature but was instead a truthful statement. *See Comstock*, 531 F.3d at 678 (declining to find defendant's consent invalid despite the officer's statement that if defendant refused to consent, defendant would remain handcuffed while he obtained a search warrant). And contrary to Defendant's assertion, she was not in "de facto" custody; she was free to leave at any time, albeit it might have been by other means then the vehicle she came in if the vehicle were to be secured.

The totality of the circumstances show that Defendant Thompson voluntarily consented to turn over her cell phone for the search. *See United States v. McConnell*, No. CR 13-273 (SRN/FLN), 2016 WL 8673065, at *5 (D. Minn. Dec. 23, 2016), *report and recommendation adopted*, No. 13-CR-273 (SRN/FLN), 2017 WL 396538 (D. Minn. Jan. 30, 2017) (finding the defendant voluntary consented after considering various factors); *United States v. Abdow*, No. CRIM.09292JMRSRN, 2010 WL 1839316, at *8–9 (D. Minn. Feb. 22, 2010), *report and recommendation adopted*, No. 09CR29201JMR/SNR,

2010 WL 1839311 (D. Minn. May 6, 2010) (same).[21] Therefore, her motion to suppress evidence must be denied.[22]

### B. Defendant's Motion to Sever

Defendant Thompson has also filed a Motion to Sever Counts. (Doc. No. 54.) Defendant Thompson asserts the following reasons for severance:

1. The Defendant may wish to testify on her own behalf on one of the counts, but not the other, forcing her to choose the unwanted alternative of testifying as to both or testifying as to neither.

2. Evidence which would be inadmissible were the counts tried separately may be admitted and considered by the jury to the prejudice of Defendant.

3. The jury will have insurmountable difficulty distinguishing evidence presented on one count from that evidence presented on the other count, and will inevitably consider the evidence cumulatively.

4. Defendant will obtain a fair and more impartial trial if she is tried separately on each count.

(Doc. No. 54; *see also* Doc. No. 90, Def.'s Mem. in Supp. of Mot to Sever Counts ("Def.'s Sever Mem.").) In particular, Defendant Thompson would like to testify as to memory lapses and hallucinations, as well as the high doses and frequency of meth use in

---

[21] The case cited by Defendant, *United States v. Jefferson*, 650 F.2d 854, 858 (6th Cir. 1981), is both non-precedential and distinguishable. In that case, the defendant was threatened with being detained if he did not consent to a search. Here, Defendant Thompson was free to leave at any time and she was not threatened with detention or otherwise.

[22] Because this Court concludes that suppression must be denied for the above reasons, the Court need not address the Government's alternative arguments. However, this Court notes that the record also supports finding that Defendant's phone would have inevitably been discovered because Investigator Weber testified that he would have applied for a search warrant had Thompson not consented.

13

August 2017, as it relates to Count 1 in the Indictment (Production of Child Pornography), but would want to exercise her right to remain silent on Count 3 (Receipt of Child Pornography). (Doc. No. 90, Def.'s Sever Mem. 2.) The Government opposes this motion. (Doc. No. 104.)

Federal Rule of Criminal Procedure 8(a) provides that an indictment "may charge a defendant in separate counts with two or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Rule 8(a) should be "construed broadly in favor of joinder" and joinder of counts is appropriate when they are "factually interrelated." *See United States v. Rock*, 282 F.3d 548, 552 (8th Cir. 2002).

Courts have discretion under Fed. R. Crim. P. 14(a) to sever offenses in the same proceeding when the joinder of counts would prejudice a defendant. "A general complaint of prejudice is an insufficient basis for severance." *United States v. Abdul-Ahad*, Crim. No. 08-142(7) (DSD/SRN), 2009 WL 35473, at *2 (D. Minn. Jan. 5, 2009). "No prejudice results from the refusal to sever when evidence of one charge would be admissible in a separate trial on the other." *United States v. McCarther*, 596 F.3d 438, 442 (8th Cir. 2010). "[T]here is a strong presumption against severing properly joined counts." *Id.*

Here, Counts 1 and 3 are properly joined because they "are of the same or similar character," and evidence for Count 1 was only discovered because of the investigation involving Count 3; therefore, evidence for each count will overlap. Fed. R. Crim. P. 8(a); *see United States v. Reynolds*, 720 F.3d 665, 670 (8th Cir. 2013) (finding that "the

conduct was discovered at the same time; therefore the evidence used at trial for each count would largely overlap"). The question is whether any resulting prejudice when prosecuting the counts together would require severance.

Defendant Thompson argues she would be prejudiced by joinder because she wants to testify regarding Count 1, but wants to remain silent with regard to Count 3. "A defendant arguing for severance on this basis must make a 'persuasive and detailed showing regarding the testimony [s]he would give on the one count [s]he wishes severed and the reason [s]he cannot testify on the other counts.'" *United States v. McCarther*, 596 F.3d 438, 443 (8th Cir. 2010) (quoting *United States v. Possick*, 849 F.2d 332, 338 (8th Cir. 1988)); *see also United States v. Little Dog*, 398 F.3d 1032, 1038 (8th Cir. 2005) (stating defendant must provide the court with a sufficient showing that she has "important testimony" to provide on one count, and a "strong need to refrain from testifying" on the other count). Wanting to testify to one count but not the other "is not enough to require severance." *Little Dog*, 398 F.3d at 1037.

Here, Thompson has explained why she would want to testify as to Count 1, but she has not given any reasons for why she does not want to testify regarding Count 3 or why the testimony she intends to give for Count 1 would not be equally relevant to Count 3. This is not adequate to meet her burden of making a persuasive and detailed showing on the issue. *See McCarther*, 596 F.3d at 443; *Little Dog*, 398 F.3d at 1037 (finding no severe prejudice when a defendant wished to testify about counts involving sexual crimes, but not testify about allegations of obstruction); *United States v. Redding*, 16 F.3d 298, 300–01 (8th Cir. 1994) (holding that defendant did not meet the "persuasive and

15

detailed" burden where proffered testimony was not sufficiently detailed and his reasons for not testifying about the remaining counts were not persuasive). Accordingly, this Court recommends that Defendant Thompson's Motion to Sever Counts (Doc. No. 54) be denied.

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1. Defendant's Second Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 74) be **DENIED**; and

2. Defendant's Motion to Sever Counts (Doc. No. 54) be **DENIED**.

Date: January 3, 2020

*s/ Becky R. Thorson*
BECKY R. THORSON
United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b), any party may file and serve specific written objections to this Report and Recommendation by **January 17, 2020**. A party may respond to those objections by **January 31, 2020**. All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 7 days from the date of its filing. If timely objections are filed, this Report will be considered under advisement from the earlier of: (1) 7 days after the objections are filed; or (2) from the date a timely response is filed.